Nathaniel SIMS, Appellant,

v.

DISTRICT OF COLUMBIA,
et al., Appellees.

No. 05–CV–801.

District of Columbia Court of Appeals.

Argued Jan. 10, 2007.
Decided Oct. 4, 2007.

Nathaniel Sims, pro se.

Stacy L. Anderson, with whom Robert J. Spagnoletti, Attorney General for the District of Columbia at the time the brief was

filed, and Todd S. Kim, Solicitor General, were on the brief for appellees.

Before RUIZ and KRAMER, Associate Judges, and SCHWELB, Senior Judge.

KRAMER, Associate Judge:

Appellant, Nathaniel Sims, a former employee of the District of Columbia, appeals from a decision of the Superior Court denying his petition for review of an order from the Office of Employee Appeals (OEA), which in turn affirmed a hearing examiner's determination that his grievance should be denied. He had sought relief from the OEA after he was terminated from a position as the Executive Director of the Educational Institution Licensure Commission and was reassigned at a lower salary to the position of program manager for the Water and Sewer Utilities Administration of the Department of Public Works. He contends that he was demoted in violation of the District's civil service laws. We disagree and affirm.

### I

The relevant facts are essentially undisputed. Sims began working for the District of Columbia government in February 1973 in an Excepted Service position as an expert in the Office of Personnel. He continued to occupy various Excepted Service appointments with the District until April 1979, when he was terminated from his position as Chief Hearing Examiner for the D.C. Rental Accommodations Office. In September 1979, Sims was reinstated to the Excepted Service as an educational and training analyst with the Office of Licenses and Permits at Grade DS–13, Step 3. Sims still occupied this position when, on January 1, 1980, provisions of the Comprehensive Merit Personnel Act of 1978 [1] (CMPA) became effective that automatically reclassified all District employees, with certain exceptions not here relevant, into the Career Service.[2] Under the relevant criteria, Sims's classification with the Office of Licenses and Permits changed from being in the Excepted Service to being in the Career Service. This change to the Career Service provided him with additional job security and procedural rights which prevented his demotion or termination except for cause, because of a reduction in force, or upon his knowing and voluntary waiver of his civil service rights.[3]

---

1. D.C.Code § 1–601.1 et seq. (1981) currently D.C.Code § 1–601.01 et seq. (2001). Information on the history of the CMPA's enactment can be found in Sims v. District of Columbia, 531 A.2d 648, 649–50 (D.C.1987) (Sims I), and Am. Fed'n of Gov't Employees v. Barry, 459 A.2d 1045, 1047–49 (D.C.1983), and need not be repeated here.

2. See D.C.Code §§ 1–602.1, 602.4, 608.1 (1981); 27 D.C.Reg. 4342 (1980).

3. See generally, D.C.Code § 1–608.1 (1981); 6 DCMR § 800 et seq. (1985). Note that while the CMPA took effect on March 3, 1979, its implementing regulations with respect to Excepted and Career Service employees were not promulgated until October 1, 1982, and April 5, 1985, respectively. See 29 D.C.Reg. 4285 (1982) and 32 D.C.Reg. 1857 (1985). In the meantime, the Code of Federal Regula-

tions and the Federal Personnel Manual that had governed the District government's personnel matters remained in effect. See 25 D.C.Reg. 10002 (1979); 27 D.C.Reg. 803 (1980); 27 D.C.Reg. 1450 (1980). The federal provisions therefore were still technically in effect during the personnel action here at issue, which occurred in 1980. However, both parties have relied on the subsequent regulations effectuating the CMPA in both the proceedings below and before this court. The District concedes that Sims would have been entitled to the same protections under the federal rules as under those later adopted pursuant to the CMPA, and Sims does not allege that he has been disadvantaged by the government's citation to the later rules. Therefore, since the parties appear to agree that any relevant changes did not affect the substantial rights at issue and since the alter-

At that time, the CMPA also gave the Mayor the discretion to appoint a limited number of persons—a maximum of 100—to Excepted Service positions among subordinate D.C. agencies. D.C.Code § 1–610.3 (1981). It specifically provided that these Excepted Service positions are meant to apply to employees "who report[ ] directly to the head of an agency" and "whose primary duties are of a policy determining, confidential, or policy advocacy character." D.C.Code § 1–610.2 (1981). Excepted Service employees, unlike Career Service employees, are not subject to civil service requirements or protections, and thus do not have job tenure or the right to appeal termination of their employment. D.C.Code § 1–610.5 (1981). In order to insure that a Career Service employee does not lose his or her protections unknowingly, an employee in the Career Service cannot be moved into the Excepted Service unless the employee first signs a waiver of his Career Service rights.[4]

Effective December 14, 1980, the Mayor appointed Sims to a position at pay grade DS–14, Step 1, ostensibly in the Excepted Service, as the Executive Director of the Educational Institution Licensure Commission (EILC), the body responsible for regulating private educational institutions in the District of Columbia. The authority cited for the appointment was D.C. Law § 1–104, the Education Licensure Commission Act of 1976, which allowed the Commission to "appoint such personnel as it deems necessary," and provided that "such positions shall be excepted."[5] Sims did not, however, sign a waiver relinquishing his Career Service rights and benefits. Nevertheless, the personnel action for effectuating this change clearly states that it is an "Excepted Appointment," and subsequent personnel action forms related to Sims's service in the EILC also identify his employment there as being in the Excepted Service.

Effective December 14, 1983, the chairman of the EILC promoted Sims, in his capacity as Executive Director, from pay grade DS–14 to DS–15. In May 1985, however, Sims's advancement to the DS–15 pay grade was rescinded on the grounds that the "authority to approve such action rests with the City Administrator [as the Mayor's designee], rather than the Chairman, EILC." See Sims I, supra, 531 A.2d at 649. Sims sued in the Superior Court to enjoin the recision of his DS–15 pay grade and to enjoin the District from seeking to recoup the additional salary he had been paid while holding that grade. The Superior Court granted summary judgment in favor of the defendants, and Sims appealed to. this court. The Sims I court framed the issue as follows: "The controlling question in this case is whether [the statutory] authority of the EILC to appoint (and hence to promote) its personnel survived the passage of the Comprehensive Merit Personnel Act ... enacted two years after the establishment of the EILC...." Id. at 649. Finding that "by the terms of the CMPA standing alone, the 'personnel authority' for the EILC is the Mayor," this court affirmed the Superior Court's award of summary judgment. Id. at 650–51.

On January 27, 1987, while Sims I was pending, Sims, who was still employed by the District of Columbia as the Executive

---

native would involve our attempting to retry on appeal a twenty-seven year-old case with authority upon which neither party nor the Court relied, we will continue to cite to the 1982 and 1985 regulations promulgated after the CMPA took effect.

4. See n. 11, infra.

5. D.C. Law 1–104, § 5(b), 23 D.C.Reg. 8734 (1977).

Director of the EILC at pay grade DS–14, received written notice that he was being terminated from that position, effective February 14, 1987, and reappointed, effective February 15, 1987, to a lower-paying DS–13 Career Service position within the Water and Sewer Utilities Administration of the Department of Public Works (DPW). The grade (DS–13) and step (7) he was given at the DPW were the same level he would have attained if his appointment to the position of Executive Director of the EILC had never happened, and he had simply stayed in his same Career Service position throughout the relevant time period. Sims filed a grievance based upon these changes, which was denied. He then petitioned the OEA for review, and the proceedings that are the subject of this appeal followed.

## II

Sims's basic contention is that the District of Columbia took an adverse employment action against him without providing him the benefit of protections to which he claims to have been entitled, and further, that it did so under the pretext that the position he occupied at the time was in the Excepted Service and therefore not subject to such protections. Under Sims's theory, his promotion to grade DS–14 as Executive Director of the EILC was valid, but the District's attempt to classify that position as being within the Excepted Service was not. He therefore claims that he held the position and its DS–14 grade not as an Excepted Service employee, but rather as a Career Service employee. As a result, he claims, he is entitled to back pay to make up the difference between the DS–14 grade—of which, he claims, he was improperly deprived for the period from 1987 to 1997—and the DS–13 grade, for which he received pay. In addition, he seeks to have his pension payments, both retroactively and prospectively, recalculated to reflect that he retired in 1997 at grade DS–14.

Sims advances two broad arguments in support of these claims. The first is that the Mayor lacked the authority to appoint him to the Excepted Service because he had already exhausted his statutory allotment of discretionary appointments. The second is that procedural flaws rendered respondents's attempt to move him from the Career Service to the Excepted Service ineffective.

## III

### A. Mayoral Authority Claim

■ Sims contends that "the Mayor had reached the statutorily authorized limit of 100 Excepted Service positions prior to the attempt of 'excepting' Sims's position, and therefore the attempt to place Sims in the Excepted Service was without authority and thus void." He concedes, however, that he did not make this claim during the agency proceedings. The District asserts that because this claim was not raised before the OEA, it was waived. We agree.

■ It is a principle of long standing that "[a]dministrative and judicial efficiency require all claims be first raised at the agency level to allow appropriate development and administrative response before judicial review." *Orius Telecomm. v. District of Columbia Dep't of Employment Servs.*, 857 A.2d 1061, 1068 (D.C.2004) (quoting *Hill v. District of Columbia Dep't of Employment Servs.*, 717 A.2d 909, 912 (D.C.1998)).[6] Therefore, only under "ex-

**6.** *See also Hughes v. District of Columbia Dep't of Employment Servs.*, 498 A.2d 567, 570 (D.C.1985); *Fair Care Found. v. Dist. of Columbia Dep't of Ins. and Sec. Regulation*, 716 A.2d 987, 993 (D.C.1998); *Washington Hosp. Ctr. v. District of Columbia Dep't of*

ceptional circumstances," *Jewell v. District of Columbia Police and Firefighters Ret. and Relief Bd.*, 738 A.2d 1228, 1231 (D.C. 1999), where "manifest injustice" would otherwise result, *Goodman v. District Columbia Rental Hous. Comm'n*, 573 A.2d 1293, 1301 (D.C.1990), will the court consider claims that were not presented to the agency. This test has not been met here.

### B. Claims of Procedural Errors by the Hearing Examiner.

■ Sims asserts that the hearing examiner erred in failing to grant him a hearing or to compel timely discovery to help him develop his claims. Both of his allegations of error, however, are based on the premise that the errors affected Sims's ability to build an evidentiary record. But the basis of his claims are matters of public record: (1) the CMPA's requirements that the Mayor publish lists of Excepted Service positions and their appointees, as well as changes thereto, in the D.C. Register within specified time limits;[7] and (2) the lists actually published from 1979 to 1983. When asked at oral argument what prevented him from compiling this information, the answer was that "a lot was happening at the time," that he changed lawyers twice during the instant proceedings, that it was difficult for him to locate copies of the D.C. Register and that the record was being developed over a long period of time. These reasons, even if viewed in their totality, simply do not amount to "exceptional circumstances."[8]

We note, however, that even if we were to decide this issue in Sims's favor, which we do not, our ultimate disposition would be the same, because we agree with the

OEA's conclusion that Sims's appointment to the Excepted Service was invalid on other grounds. Thus, we turn to what we consider to be the dispositive question, that is, whether Sims obtained a vested right in the salary that accompanied his appointment.

### C. Invalidity of Sims's Appointment to the Excepted Service

Sims's main argument is that even if the Mayor had the authority to appoint him to the Excepted Service and invoked the proper law in doing so,

> the failure to honor the procedural requirements of the law as relating to the appointment—a conference regarding the diminution of rights and benefits, a written waiver of acceptance, and a publication of appointment within 45 days as required in converting from a career DS–13 to an Excepted Service DS–14— renders the appointment invalid.

■ Before reviewing these contentions, we reiterate our function in the OEA review process, which we have previously described as follows:

> Although this case comes to us via the Superior Court, the scope of our review is the same as if it had come to us directly from the agency. Thus, in the final analysis, *confining ourselves strictly to the administrative record, we review the OEA's decision, not the Superior Court's,* and we must affirm the OEA's decision so long as it is supported by substantial evidence in the record and otherwise in accordance with law.

---

*Employment Servs.,* 712 A.2d 1018, 1019–1020 (D.C.1998).

7. D.C.Code § 1–610.3(c) (1981).

8. This conclusion also resolves Sims further assertion that the hearing examiner erred by not requiring the respondents to demonstrate that the OEA's delay in rendering its decision did not substantially prejudice him.

*Settlemire v. District of Columbia Office of Employee Apps.,* 898 A.2d 902, 905 n. 4 (D.C.2006) (emphasis added).[9]

■ While Sims provides numerous grounds for his argument that his appointment to the Excepted Service was invalid,[10] we need not examine these because the OEA agreed that it was invalid. Specifically, it ruled: "Apparently, [the District] neglected to have Employee waive Career Service rights as required by the applicable personnel regulations and, as a result, Agency's action appointing Employee to the Excepted Service was rendered ineffective."

■ The District, moreover, does not argue that the agency's conclusion lacked substantial evidence in the record. Indeed, it effectively concedes that Sims did not provide a written waiver and represents: "It was undisputed below ... that appellant did not waive his Career Service rights in writing when he accepted this Excepted Service position." The District also does not argue that the agency's decision in this respect was contrary to the law. Rather, the District's position is that this court "need not resolve this conflict because appellant received everything to which he could have been entitled under the CMPA when he was terminated from the Excepted Service position and returned to the Career Service at DS–13 and step 7."

Although the agency did not cite authority for its decision that the lack of a waiver of Career Service rights rendered Sims's appointment invalid, this conclusion is supported by the regulations of the D.C. Office of Personnel governing changes to positions with lesser rights: "Any internal placement of a Career Service appointee to a position with less rights and benefits *shall not be effective* unless the employee has waived the rights and benefits in writing; and the waiver shall be made a permanent part of the employee's Official Personnel Folder." 6 DCMR § 833.2 (1985) (emphasis supplied). Here, the OAH found that "following [Sims's] conversion to the Career Service," the District "offered [him] a position in the Excepted Service as the Executive Director at grade DS–14." As an Excepted Service employee, Sims obviously had "less rights and benefits" with respect to job retention than he did in the Career Service. Moreover, the OEA found that "[the District] neglected to have Employee waive his Career Service rights...." *Id.* These are the very rights that Sims would have surrendered by accepting placement in the Excepted Service. Based upon these findings, the OEA then concluded that "as a result, Agency's action appointing Employee to the Excepted Service was rendered ineffective." *Id.* Given the plain wording of 6 DCMR § 833.2 (1985) and mindful of the deference we normally accord an agency's interpretation of its own regulations,

**9.** We note that this is why we do not look to the careful opinion of the Superior Court, which made findings that Sims had constructively waived his right to the protections because he was an expert in the personnel field, having previously worked in the Office of Personnel, and because all of the paperwork involved with the appointment specified that he was now in the Excepted Service. We are concerned that an interpretation that permitted constructive waiver could undermine the protections of this statutory scheme.

**10.** We also find unpersuasive the District's contention that Sims's claims were precluded by *res judicata* and collateral estoppel because of this Court's decision in *Sims I.* The essential fact in this case—Sims's termination from his position as the Executive Director of the EILC—had not occurred when the litigation began in *Sims I* and indeed, by the time of his termination, the *Sims I* litigation had proceeded to the stage where it was pending a final decision by this court.

see, e.g., Dorchester House Assoc. Ltd. P'ship v. District of Columbia Rental Hous. Comm'n, 913 A.2d 1260, 1263 (D.C. 2006), we cannot find the OEA's interpretation of the regulation to be unreasonable, nor its conclusion to be either "clearly erroneous as a matter of law" or one that did not "flow rationally from its findings." Raphael v. Okyiri, 740 A.2d 935, 945 (D.C. 1999).

■ Yet while Sims agrees that the reclassification from the Career Service to the Excepted Service was a nullity, he nonetheless insists that he obtained a vested right in the DS–14 pay grade that accompanied his appointment, and that the District therefore could not deprive him of that right except through strict compliance with civil service procedures. As authority for this proposition, Sims cites Coffin v. District of Columbia, 320 A.2d 301 (D.C. 1974), which he reads to stand for the proposition that "[i]f the contract is divisible, such that part is valid, but another part is ultra vires, the invalidity does not ordinarily affect the parts of the contract which are not dependent upon the invalid part." Therefore, according to Sims, "the valid part may be enforced while that which is invalid may be rejected."

In disposing of this point, the OEA began by stating that the District's "failure to obtain a waiver does not entitle an employee to remain a DS–14." It explained that because [Sims] "no longer serves as the Executive Director" and "his appeal to this Office does not seek reinstatement to that position," he "cannot continue to claim any of the emoluments associated with that position." Thus, the OEA concluded, the District "has no obligation to pay Employee anything other than the wage associated with his present position as Utility Program Manager." The OEA therefore rejected Sims's Solomonic attempt to split his appointment as

the EILC's Executive Director into two constituent parts and found that because the appointment to the EILC was invalid, the promotion to a Grade 14 was also necessarily invalid. The OEA concluded that the appointment as the Executive Director, at a DS–14 level, was not cancelled, but rather, as a matter of law, it was never legally effectuated in the first place.

The OEA's position, in essence, is that the waiver required by 6 DCMR § 833.2 (1985) is a prerequisite to the executive's exercise of the legal authority to make Excepted Service appointments for positions deemed by the Mayor to be key without limiting his or her flexibility to remove such person from that position at will. The waiver also ensures that District employees who are selected to move from the Career Service to the Excepted Service are adequately informed of the protections that they lose as a result of that move. Thus, according to the OEA's reasoning, since Sims's appointment to the Executive Director position was invalid because he never signed the necessary waiver, he cannot now use the DS–14 grade he achieved solely by virtue of the invalid appointment to an Excepted Service position as the basis to seek damages. Simply put, without a signed waiver, the Mayor or his designee did not have the legal authority under 6 DCMR § 833.2 (1985) to effect the appointment to the Excepted Service.

Stated differently, the OEA's reasoning is that although the District violated 6 DCMR § 833.2 (1985) by offering Sims an appointment to the Excepted Service without satisfying the necessary prerequisites, Sims cannot obtain damages resulting from this violation because he was not in any way injured by it. On the contrary, Sims was able to take advantage of an opportunity which the District had no legal obligation to extend to him, that is, the chance to be paid at the DS–14 level for a

period of six years. When that opportunity was over, Sims was no worse off for having had it. Rather, he had benefited by being paid at the DS–14 level while in the position, and simultaneously retaining his Career Service rights at the DS–13 level. Indeed, when transferred to the DPW, he received all of the step increases commensurate with his total time in service, including the time he served as the Executive Director of the EILC.

Although we express no opinion, this case might be different if Sims had actually suffered harm from the violation of 6 DCMR § 833.2 (1985), for example, by being unwittingly lulled into the Excepted Service by the promise of a higher pay grade and then terminated outright or by being returned to the Career Service at a lower grade and/or step than he otherwise would have achieved in the same amount of time. He might well then have standing to raise the violation[11] because under the OEA's reasoning, the waiver requirement of 6 DCMR § 833.2 (1985) is a shield that can be wielded by either the employer or the employee, depending on the circumstances. On the one hand, it protects the employer by rendering ineffective an appointment to the Excepted Service of an employee who retains Career Service rights, thereby preserving the Mayor's right to exercise maximum discretion over the limited number of Excepted Service positions; on the other hand, it protects the employee by allowing him or her to make an informed choice about whether or not to leave the security of the Career

Service to pursue an opportunity in the Excepted Service. Simply stated, without the requisite waiver, the appointment of a Career Service employee to the Excepted Service has no legal effect.

This interpretation of the regulation, moreover, is consistent with its wording and the general purposes of the system, which are to ensure that applicants for positions in government service are hired and promoted based on merit—not patronage—and to protect incumbents from arbitrary, capricious, or politically-motivated employment actions. *See Sampson v. Murray*, 415 U.S. 61, 71, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974) ("a primary purpose of that system was to remove large sectors of Government employment from the political 'spoils system' which had previously played a large part in the selection and discharge of Government employees"); *Crete v. City of Lowell*, 418 F.3d 54, 59 (1st Cir.2005) (listing "[b]asic merit principles [that] should guide all decisions in the civil service system").

Based on the foregoing analysis, we conclude that the OEA's decision denying Sims's claim for damages is supported by substantial evidence in the record and is otherwise in accordance with law. Accordingly, we

*Affirm.*

---

**11.** To the extent 6 DCMR § 833.2 (1985) protects employers, employees have a parallel provision in 6 DCMR § 834.1 (1985), which provides: "Except as waived in accordance with § 833.2, an employee's rights and benefits with respect to continued employment shall not be reduced by promotion, demotion, or reassignment." This adds further support to the OEA's conclusion that in the absence of

a waiver, an appointment to the Excepted Service is a total nullity because an employee cannot hold an Excepted Service position and still maintain Career Service rights with respect to that position. *See* D.C.Code § 1–610.1 (1981) ("Persons appointed to the Excepted Service are not in the Career ... Service.").